FILED

Jeanne A. Naughton, CLERK

**July 5, 2018**

United States Bankruptcy Court
Newark, NJ

By:  /s/ Juan Filgueiras, Courtroom Deputy

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>SIDNEY AND TERESA WILLIAMS,<br><br>                              Debtors. | Case No.:      15-23287-VFP<br><br><br>Chapter   7 |
| BARBOUR GROUP, LLC,<br><br>                              Plaintiff,<br>v.<br>SIDNEY AND TERESA WILLIAMS,<br><br>                              Defendants. | Adv. Pro. No.: 15-2309-VFP |

## <u>TRIAL OPINION</u>

### <u>APPEARANCES</u>

WHITEFORD TAYLOR PRESTON, LLC
Kaan Ekiner, Esq.
Daniel A. Griffith, Esq.
The Renaissance Centre
405 N. King Street, Ste. 500
Wilmington, DE  19801
*Attorneys for Plaintiff*

SIDNEY WILLIAMS
TERESA WILLIAMS
39 Hillairy Avenue
Morristown, NJ  07960
*Pro Se Defendants*

**HONORABLE VINCENT F. PAPAPIA**
**United States Bankruptcy Judge**

## I.    INTRODUCTION

This matter came before the Court on the trial conducted on June 30, 2017 on the adversary complaint (the "Complaint") filed by Plaintiff Barbour Group, LLC (the "Plaintiff" or "Barbour Group") against Debtors-defendants Sidney and Teresa Williams (the "Debtors"), who were *pro se* in this adversary proceeding.  The Complaint seeks to except from discharge under 11 U.S.C. § 523(a)(2), (4) or (a)(6) a Confessed Judgment in favor of Plaintiff against the Debtors in the amount of $65,612.36, plus interest and counsel fees in an unstated amount, minus a $4,000 credit for payments made (the "Debt").[1]  Post-trial submissions were requested by the Court; however, only Plaintiff filed a post-trial brief.  The *pro se* Debtors were granted multiple extensions of their deadline, but did not make any further submissions.   Plaintiff requested that the record be closed by letter dated February 12, 2018.  The Court allowed additional time for the Debtors to respond, but no response was made.  As a result, the record was closed by the Court as of February 28, 2018, without any further submissions from the Debtors.

For the reasons set forth below, the Debt is excepted from discharge under 11 U.S.C. § 523(a)(2)(A) as against Teresa Williams, but the Debt of Sidney Williams to Plaintiff is subject to discharge in its entirety.

## II.    JURISDICTIONAL STATEMENT

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and the Standing Orders of Reference entered by the United States District Court on July 10, 1984 and amended on September 18, 2012.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I) and (O).  Venue

---

[1] The Complaint also sought to deny the Debtors their discharge under 11 U.S.C. §§ 727(a)(2) and (a)(4), but the Plaintiff never substantively pressed these claims.  Thus, they are deemed abandoned and dismissed on the merits.

is proper in this Court under 28 U.S.C. § 1408. The Court issues the following findings of fact

and conclusions of law pursuant to Fed. R. Bankr. P. 7052. To the extent that any of the findings

of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent

that any conclusions of law constitute findings of fact, they are adopted as such.

### III.    STATEMENT OF FACTS/FINDINGS OF FACT

### A.  General Background

The Debt arises from the parties' business and personal relationships. Both Karen Barbour

("Ms. Barbour"), Plaintiff's principal, and Debtor Teresa Williams ("Ms. Williams") were

engaged in the surety bond business, in which they obtained performance bonds for construction

companies (their clients) from insurance carriers. To address certain professional and personal

financial challenges, Teresa and Sidney Williams ("Mr. Williams") borrowed from Plaintiff the

separate sums of (i) $23,463.40 and (ii) $35,000 in January 2008, which were later reduced to a

*Promissory Note and a Confessed Judgment* (defined above as the "Debt"). Ms. Williams agreed

to serve as a sub-broker for Plaintiff in part to work off the Debt, but the relationship did not last

and concluded with Ms. Williams advising Ms. Barbour that she was terminating her business

relationship with Plaintiff by e -mail dated April 15, 2009.[2]

The primary facts that the Court had to adduce and determine during and after trial were

to:

> (i)    establish the content of the representations which Ms. Williams and/or
> Mr. Williams made to Ms. Barbour when Debtors obtained the loans
> from Plaintiff; and

> (ii)    decide whether Ms. Barbour's reliance on those statements in extending
> the loans was justified, as required by *Field v. Mans*, 516 U.S. 59, 73-75
> (1995).

---

[2] P-5. (References to Exhibits are as follows: P-__ for Plaintiff's Exhibits; D-__ for Debtors/Defendants' Exhibits).

B.  **The Parties' Business Relationship**

Plaintiff, Barbour Group, is an insurance agency that has been in existence since March 4, 2002 and is licensed in thirty-eight states, including Maryland.[3]  Ms. Barbour is Plaintiff's 100% owner and managing member.[4]  Ms. Barbour testified that a company like Plaintiff enters an agency agreement with insurance companies (called "markets") that provide surety bonds for construction projects.[5]  The Plaintiff/Ms. Barbour is an agent and a fiduciary of each market under the agency agreement; has power of attorney to bind the market-principal; collects insurance premiums from construction contractors to purchase the bond; and holds those premiums in trust for the market.[6]  Agents such as Ms. Barbour and Ms. Williams are required to renew their licenses every two years and certify as part of renewal that the agent is "not in litigation" and "not . . . doing anything fraudulent,"[7] including misappropriating premiums.

Ms. Barbour testified that her company, the Plaintiff Barbour Group, had a good reputation in the industry, but that certain markets did not want to do business with her because she could not produce enough premium.[8]  For example, according to Ms. Barbour, Travelers tried to terminate her agency contract for failure to produce premium, but did so incorrectly and "violated some protocol," so that Ms. Barbour filed an administrative action against Travelers.[9]  Travelers and Plaintiff settled and parted company.[10]

Ms. Barbour met Ms. Williams when Ms. Barbour was working at an agency in 1998.[11]  Ms. Barbour described Ms. Williams as "my underwriter," then working for The Hartford[12] – and

---

[3] Dkt. No. 41, 6/30/17 Hr'g. Trial Tr. 87:10-14, 19.
[4] Trial Tr. 87:14-17; 90:17-18.
[5] Trial Tr. 88:2-23.
[6] Trial Tr. 88:8-23; 89:8-25.
[7] Trial Tr. 90:1-9; 10:15-19.
[8] Trial Tr. 91:2-7.
[9] Trial Tr. 91:8-15.
[10] Trial Tr. 91:8-15.
[11] Trial Tr. 91:16-20.
[12] Trial Tr. 90:19-23; 91:16-25.

as "a really good" one.[13]  Ms. Barbour testified that, at a date unstated, she "heard that [Ms. Williams] had left the Hartford and started her own agency."[14]  Ms. Barbour and Ms. Williams reconnected when Ms. Barbour was seeking coverage for a contractor through an entity called D.H. Lloyd with which Ms. Williams also had contacts.[15]

Ms. Williams testified that she became a surety bond agent in January 2006 and continued to work in that capacity until "around" January 2009.[16]  In or about January 2006, Ms. Williams formed a company called Surety Solutions, LLC ("Surety"), which she described as a "50/50 partnership" with one Mareco Edwards ("Mr. Edwards") to conduct the surety bond agency business.[17]

## C. Ms. Williams' and Ms. Barbour's Personal Relationship and the Further Development of Their Business Relationship

Ms. Williams testified that she knew Ms. Barbour "for a long time" because there are few women in the surety business, "but we developed a stronger friendship . . . in maybe '05, '06."[18]  Ms. Williams testified that she understood from her industry contacts that Ms. Barbour "did not have the greatest reputation" and opined that Ms. Barbour did not have access to markets "[b]ecause people did not trust [her]."[19]  Before Ms. Barbour and Ms. Williams began working together formally, Ms. Williams provided Plaintiff with "[a]ccess to markets."[20]  As an illustration of market access, Ms. Williams testified that she informally sub-brokered an account for Plaintiff through Travelers, struck all reference to Plaintiff from the application, and was later "scolded" by Travelers for sub-brokering for Ms. Barbour.[21]

---

[13] Trial Tr. 93:12-13.
[14] Trial Tr. 92:1-5
[15] Trial Tr. 92:6-18.
[16] Trial Tr. 9:18-19; 11:4-7.
[17] Trial Tr. 12:9-21.
[18] Trial Tr. 21:12-20.
[19] Trial Tr. 47:13-48:3.
[20] Trial Tr. 48:25-50:3.
[21] Trial Tr. 50:4-14

In "2007, 2008," Ms. Williams and Surety developed a business relationship with Ms. Barbour and Plaintiff.[22]  Ms. Williams became a sub-broker to Plaintiff, meaning that she placed business with markets to which Plaintiff did not have access, specifically:  Travelers, Great American, CBIC [Contractors Bond Insurance Corporation], CNA Surety; and, she introduced Ms. Barbour to Capital Indemnity.[23]  Ms. Williams denied that she told Ms. Barbour that Ms. Williams had access to these other markets as an inducement to Ms. Barbour to hire Ms. Williams, and indicates a different chronology—that she began to work formally for Ms. Barbour *as a consequence* of having borrowed money from her in January 2008, but not before.[24]  Ms. Williams testified:

> I became a sub-broker to Karen because I was trying to transition because of all the issues that I had with my partner, so there was no inducement by access to markets.  We came together so that I can assist her in her business and at the same time I can help pay off the debts that I owed her.[25]

Ms. Barbour's testimony seemed to be that Ms. Williams entered the sub-broker relationship (under which Ms. Williams became a "1099 type producer," not an employee)[26] for their mutual benefit and before Ms. Barbour learned about irregularities at Surety Solutions, LLC:

> Teresa was a really good underwriter and I needed an underwriter, my agency was growing, and so she was looking to try to recoup some money so I thought well I can engage you as my -- as an underwriter and I'll pay you a fee for that as a consultant, which I did.  And then also accounts that she needed to place through my markets, we had a commission split on those.[27]

Ms. Barbour testified that she learned that one of the markets was accusing Ms. Williams of defalcation only *after* Ms. Williams became a sub-broker for her, but Ms. Barbour clearly knew

---

[22] Trial Tr. 21:21-22:3.
[23] Trial Tr. 22:4-20; 23:8-15.
[24] Trial Tr. 23:16-24:1.
[25] Trial Tr. 23:22-24:1.
[26] Trial Tr. 93:8-9.
[27] Trial Tr. 93:12-18.

that Westchester had sued Ms. Williams, Mr. Edwards and the other entities in 2007, before she loaned the money to the Debtors in January 2008. This information is threaded through the testimony of both parties about the unpaid premiums owed as to Lexon Surety, as is described in more detail below.

### D.  The Westchester Fire Insurance Company Lawsuit

As Ms. Williams testified, the fortunes of Surety declined rapidly after its January 2006 founding. Ms. Williams intended that Mr. Edwards "would be the business development person" and that she would put together and market "the packages."[28] But Westchester Fire Insurance Company ("Westchester"), the first market that Mr. Edwards and she obtained as Surety Solutions, filed a Complaint dated December 6, 2007 in United States District Court for the Eastern District of Pennsylvania based on conduct which came to the attention of Westchester "the latter half of 2006."[29] Westchester sued Surety, Mr. Edwards, Ms. Williams, and two other entities with addresses at Debtors' residence, Capital Surety Associates, LLC, and National Insurance Consultants, Inc. ("NICI"), for various irregularities, including issuing bonds without authorization, failing to report transactions, and significantly for this case, collecting and failing to turn over premiums.[30] The Complaint asserts that, after Westchester discovered irregularities, it issued a termination notice on January 12, 2007, effective April 12, 2007.[31]

---

[28] Trial Tr. 52:2-13.

[29] P-6, Compl., ¶¶ 30-32.

[30] Westchester alleged that it entered an agency contract with NICI on March 1, 2006 and was advised by Defendants "[a]t some point in 2006" that NICI was changing its name to Surety. Surety and Westchester entered their agency contract on July 1, 2006. P-6, Compl. ¶¶ 18-20. In the instant case, Ms. Williams testified, "I have no knowledge of National Insurance Consultants or Capital Surety Associates." Trial Tr. 29:23-25; 30:2-5. The parties stipulated in their joint pre-trial statement filed on June 29, 2017 that Ms. Williams never had an ownership interest in those two entities and that they never operated from her residence at 9129 Belleau Trail, Fort Washington, Maryland (as the Westchester Complaint indicated). Dkt. No. 40, *Final Amended Joint Pre-trial Order*, Part II, Stipulated Facts, ¶¶ 5-6. The issue of whether Ms. Williams had any knowledge of these two entities is not relevant to the Court's determination.

[31] P-6, Compl. ¶¶ 30-32.

Ms. Williams testified that Mr. Edwards had issued improperly documented bonds and had failed to record the bonds because he had a close relationship with a Westchester underwriter, who approved the bonds by telephone.[32]   In fact, throughout her testimony as to Westchester and other similar "markets," Ms. Williams sought to place most or all of the blame for Surety's (and her) financial problems on Mr. Edwards.

Ms. Williams testified that she also had various serious personal issues that prevented her from focusing on her business at this time.  First, she delivered her son by emergency C-section on October 28, 2006.  Additionally, Mr. Williams' mother died in February 2007 after the Debtors cared for her for the last six months of her life.[33]

### E.  The Lexon Surety, Westchester and IFIC Misappropriations

#### (i)      Lexon

On January 4, 2008, Ms. Barbour received a telephone call from Chris Dobbs of Lexon Surety:[34]

> Chris Dobbs of Lexon Surety called me up and he said I hear you have Teresa Williams working for you and I said she doesn't work for me, she's a sub-broker and a consultant, she is not an employee.
>
> And they said well if she is an employee we don't want to do business with you.  And I said she is not an employee, whatever documentation you need for us to show you that, I can show you she's not an employee.
>
> And they said well we have been sending her lots of premium notices, she owes us a lot of money, and if she doesn't pay it we're going to put her in jail.[35]

Ms. Barbour continued:

---

[32] Trial Tr. 51:2-19.
[33] Trial Tr. 52:14-23; 54:5-8.
[34] Ms. Barbour testifies that her conversation with Dobbs occurred "[o]n one four," which the Court interprets to mean January 4, 2008."  Trial Tr. 99:1-3.
[35] Trial Tr. 93:23-94:8.

> Chris Dobbs was quite angry on the phone and he told me that . . .
> if this wasn't paid I think that day or by tomorrow that they were
> going to come and have her arrested. . . .
>
> …
>
> COUNSEL:  Do you know why he said Ms. Williams as opposed to
> Mr. [Mareco] Edwards?
>
> MS. BARBOUR:  I didn't know.  I mean Teresa Williams was the
> only one he mentioned.
>
> COUNSEL:  And how did you respond?
>
> MS. BARBOUR:  I got nervous.  I didn't want anything to happen
> to Teresa.  *I know she was fighting that case with Westchester* and
> she said Mareco Edwards had harmed her and she, when I
> approached her she said this must be another situation with Mareco
> Edwards I didn't know about.
>
> And I felt really bad for her. . . . [36]

Ms. Barbour then repeated to Ms. Williams the January 4, 2008 conversation that Ms.

Barbour had with Chris Dobbs of Lexon.  Ms. Barbour's actions and testimony indicate that her

conversation with Ms. Williams also took place on January 4, 2008:

> MS. BARBOUR:  . . . I said [to Teresa] what's going on and she
> goes it must be something else that Mareco Edwards has done, he
> must have got a hold of powers or something.  I don't – I didn't
> know that I owed them money.
>
> COUNSEL:  Did you ask Ms. Willliams if she had misappropriated
> the premiums that were owed to Lexon?
>
> MS. BARBOUR:  . . . I asked her, I said do you owe this money and
> she said I didn't – I don't know about owing Lexon any money.
>
> COUNSEL:  Was it important for you to know, in your business
> relationship with Ms. Williams . . . whether or not she was
> misappropriating premiums?
>
> MS. BARBOUR:  . . . Yeah, I don't want to be associated with that.

---

[36] Trial Tr. 96:21-97:18 (emphasis supplied).

9

> COUNSEL:  Would you ever have lent Ms. Williams any money if you knew she was misappropriating premiums for [sic] your markets?
>
> MS. BARBOUR:  No.
>
> COUNSEL:  How come?
>
> MS. BARBOUR:  Because that's fraud, that's stealing.[37]

The Lexon issue was resolved when Plaintiff made the Initial Loan to Ms. Williams in the amount of $23,463,40, i.e., premiums Lexon asserted were misappropriated by Ms. Williams.

### (ii)    Westchester

Ms. Barbour confirmed that, when she received this call from Chris Dobbs, she already knew that Ms. Williams had issues with Westchester:

> COUNSEL:  So as of the time you got the call from Lexon, you already knew about the Westchester lawsuit?
>
> MS. BARBOUR:       Yes.
>
> COUNSEL:  . . . were you aware that Westchester was accusing Ms. Williams of misappropriating premiums that were owed to Westchester?
>
> MS. BARBOUR:   . . . Teresa told me that Westchester is not going to go after her, that they're only going to go after Mareco because they know that they had given Mareco his own power of attorney and seal and she had no knowledge of that.
>
> So because of that she would be exonerated from that because they had given Mareco his own . . . method and means of issuing bonds without her knowledge.  So she said that she . . . was going to be excused and that Mareco was going to pay that and it was going to go away.[38]

---

[37] Trial Tr. 94:12-95:3.
[38] Trial Tr. 97:23-98:12.

As Ms. Williams testified at trial, however, the Westchester matter "went away" because Ms. Williams paid Westchester $110,000, which she borrowed from her grandmother and that this sum represented "restitution" and "premium payments" owed to Westchester:

> COUNSEL:  What efforts did you take to resolve the complaint that Westchester made?
>
> MS. WILLIAMS:  Oh, I took out a loan from our family, from my grandmother for eventually the loan became $110,000 to take care of *any restitution I owed Westchester*.
>
> COUNSEL:  So at the time of the loan transaction that was made by Ms. Barbour, was the Westchester matter still open? . . . Was the complaint still outstanding?  Was the Westchester matter still outstanding --
>
> MS. WILLIAMS:  No. . . . It had been resolved.  Well at least apparently I guess they got the information they needed.
>
> COUNSEL:  And what efforts did you take to resolve it?
>
> MS. WILLIAMS:  Made some—*made the premium payments*.
>
> COUNSEL:  How much was that?
>
> MS. WILLIAMS:  A hundred and ten thousand dollars.[39]

**(iii)    IFIC**

Ms. Barbour went on to testify that after making the Loans to the Debtors, she learned that Ms. Williams was also accused of misappropriating premiums owed to IFIC:

> COUNSEL:  Have you subsequently learned that Ms. Williams was in fact misappropriating premiums that were owed to markets?
>
> MS. BARBOUR:   Yes, when International Fidelity Insurance Company called me, I think it was in '09, and they said -- I think that Teresa still was being a sub-broker with me and Anthony DeMartino who was head of contract surety called me and said you know when is -- do you think Teresa can start paying back this premium and I'm like well, she's not here. So and then I didn't hear anything more from that.

---

[39] Trial Tr. 55:24-56:18 (emphasis supplied).  See also D-4.

COUNSEL: If you knew that Ms. Williams was misappropriating premiums from IFIC would you have ever lent her any money?

MS. BARBOUR: No.

COUNSEL: Why not?

MS. BARBOUR:  Because again that's stealing and that's fraud. And what I found out from her was that it was Mareco Edwards who was issuing unreported bonds and collecting the premium and putting her in a very harmful position and I believed Teresa.

COUNSEL: Did you believe that when you lent Ms. Williams money that she denied misappropriating premiums to you in order to induce you to loan money?

MS. BARBOUR: She told me definitely it was not her, that she had nothing to do with that. And she said she has her attorneys working on that and that Mareco promised that he would pay it back.[40]

Years later, Ms. Barbour learned, when "the Maryland Insurance Administration sent that blast out" (on or about July 18, 2013), that Ms. Williams had pleaded guilty to misappropriating premiums from IFIC in the 2007-2009 period.[41]  This period includes January 2008 when Plaintiff made the Loans to the Debtors.

### F.   The $23,463.40 Initial Loan

On January 4, 2008, the same day she received the call from Lexon and then discussed it with Ms. Williams, Ms. Barbour wrote a check for $23,463.40 payable to Old Hickory Insurance Company (for the benefit of Lexon) (the "Initial Loan") by borrowing from Plaintiff's line of credit:[42]

---

[40] Trial Tr. 95:4-96:2.  See also Trial Tr. 55:12-18 (where Ms. Williams confirmed that she shared with Ms. Barbour that the "financial hardship" she was experiencing "was a consequence of the activities of [her] business partners").
[41] Trial Tr. 100:3-24; P-7, July 18, 2013 Press Release, discussed *infra*.
[42] P-1, checks dated January 4, 2008 showing (i) $23,463.40 draft from the Plaintiff's line of credit; and (ii) $23,463.40 payment to Old Hickory Insurance Company.  The parties stipulated that Old Hickory is an "entity that collected premiums on behalf of Lexon" (Dkt. No. 40, *Final Amended Joint Pre-trial Order*, Part II, Stipulated Facts, ¶ 11).

And I felt really bad for her and so I, as you can see, this check is drawn against my line of credit. I didn't have that cash. I borrowed the money for her immediately and I paid it.[43]

Ms. Barbour testified to her state of mind when she wrote this check:

COUNSEL: So let's go back to January 4 of 2008 when you wrote that check and what was in your head. You knew that Ms. Williams had been accused of misappropriating checks by Westchester, correct?

MS. BARBOUR: Well that Mareco was. But she was named in that because . . . she was an agency owner.
. . .

COUNSEL: Regardless of what she said, you knew she was being accused of misappropriating premium checks by Westchester.
. . .

MS. BARBOUR: Yes.

COUNSEL: And you knew that she was being accused of misappropriating premium checks by Lexon?

MS. BARBOUR: On one four, yeah.

COUNSEL: And you had a discussion with her about both of those things and she said she had nothing to do with it?

MS. BARBOUR: That's correct.

. . .
COUNSEL: So back in January of 2008 when you agreed to loan her the money, you know she was being accused of misappropriating premiums by Westchester and by Lexon, correct, and she had denied that?

MS. BARBOUR: Yes.

COUNSEL: And her denial induced you to loan her the money?

MS. BARBOUR: Yes. She was pretty convincing.[44]

---

[43] Trial Tr. 97:18-21.
[44] Trial Tr. 98:13-100:2.

13

### G. __Ms. Williams' Guilty Plea vs. Her General Denials__

In contrast to Ms. Barbour's specific testimony regarding Ms. Williams' representations, Ms. Williams generally denied taking insurance premiums after January 2006, or diverting them from the markets to her own use, without specifically describing what she said or did not say to Ms. Barbour about any misappropriation by Ms. Williams herself.[45]  Ms. Williams further testified that she had to maintain professional liability insurance to maintain [renew] her license and that she never reported on a professional liability insurance application that she was misappropriating premiums (as would be required).[46]   But she also testified that she did "plead guilty to misappropriation by a fiduciary" at a date that she could not recall.[47]  Her recollection was refreshed by a July 18, 2013 Press Release from the Office of the Attorney General for Maryland,[48] which states in most pertinent part:

> Attorney General Douglas F. Gansler announced today that former insurance agent Teresa E. Williams, 42, of Morristown, New Jersey, pleaded guilty in Prince George's County Circuit Court to one count of misappropriation by a fiduciary.  While working as an agent selling surety bonds for International Fidelity Insurance Company (IFIC), Williams kept premium money she owened to IFIC.  Judge C. Philip Nichols sentenced Williams to five years incarceration, all of which was suspended, plus five years probation, 100 hours of community service and Williams, who had previously repaid $10,000, was ordered to pay an additional $28,035.60 in restitution. . . .

> The investigation revealed that Williams received $38,035.60 from Prestige Construction Company, a Virginia business, over the period of August 2007 through July 2009, which Williams kept.[49]

---

[45] Trial Tr. 12:22-13:3.
[46] Trial Tr. 9:24-11:3.
[47] Trial Tr. 13:3-5; 15:6-13.
[48] P-7.
[49] P-7.

While being examined by Ms. Barbour's counsel, Ms. Williams acknowledged that she pleaded "guilty to misappropriating premiums from August 2007 through July of 2009."[50]  Ms. Barbour testified that, had she known about Ms. Williams' misappropriation from IFIC, Ms. Barbour would not have lent Ms. Williams money:

> COUNSEL:   And at that time when you saw that [Maryland Insurance Administration blast] you became aware that Ms. Williams pled guilty to misappropriating premium checks owed to IFIC between August of 2007 and 2009, correct?
>
> MS. BARBOUR:  Yes.
>
> COUNSEL:   So that would have been the exact same time as Westchester and Lexon, right?
>
> MS. BARBOUR:  Yes.
> . . .
>
> COUNSEL:   . . . it was at that time when Ms. Williams denied misappropriating any premium checks at all to you, right?
>
> MS. BARBOUR:  Yes.
>
> COUNSEL:  And it was based on that denial that you agreed to lend her the money?
>
> MS. BARBOUR:  Correct.
>
> COUNSEL:  And that denial was false, wasn't it?
>
> MS. BARBOUR:  Correct.
>
> COUNSEL:  If Ms. Williams had been truthful to you in January of 2008 would you have loaned her the money?

---

[50] Trial Tr. 17:2-21; see also Trial Tr. 20:21-21:6 and Trial Tr. 21:11 where Ms. Williams testified, "I pled guilty to misappropriation by a fiduciary, yes."  Ms. Williams also testified that her first trial ended in mistrial; that she could not afford to continue with an attorney; and that she did indeed plead guilty. Trial Tr. 17:19-18:16.  In the course of this testimony, Mr. Williams objected to (i) Plaintiff's introducing a press release rather than a court document; and (ii) linking the misappropriation to a time period rather than to a specific bond.  The Court overruled the objection and allowed the admission of the press release not for the truth of what it said, but for its relevance as to when Ms. Barbour read it, how she reacted and to refresh both parties' recollection.  The Court further advised Mr. Williams that he could bring out the distinction (time period v. number of bonds) at cross-examination.  Trial Tr. 19:13-20:20.  The meaning or significance of that distinction was not, however, further developed at trial.

MS. BARBOUR: No.[51]

In sharp contrast, Ms. Williams generally denied having a discussion with Ms. Barbour about the misappropriation of premiums and instead spoke of "challenges" and the "situation" she was facing, including Lexon's demand for payment:

> COUNSEL: Ms. Williams, in connection with issuing the check that was marked as Plaintiff's Exhibit 1, the discussion that you had with Ms. Barbour that led to her signing that check, you were both aware that Lexon was not happy with you guys, right?
>
> MS. WILLIAMS: You mean they wanted their money, yes. . . .
>
> COUNSEL: Right. And did Ms. Barbour ask you at that time where were the premium dollars that were owed to Lexon?
>
> MS. WILLIAMS: She already knew. I had already had a discussion with her about the situation.
>
> COUNSEL: And during that discussion did you tell Ms. Barbour no I did not misappropriate those premium dollars?
>
> MS. WILLIAMS: We never had a discussion about misappropriation of dollars.
>
> COUNSEL: What did you tell --
>
> MS. WILLIAMS: *We never like had that kind of discussion*.[52]

Later, when faced with a similar line of questioning, Ms. Williams stated, "I do not remember having that discussion with Ms. Barbour," *i.e.*, about misappropriating premiums.[53] At the same time, Ms. Williams also testified that she was "very transparent with Ms. Barbour, extremely transparent."[54] Notwithstanding her claim of transparency, when faced with the direct question of whether Ms. Barbour asked her about the misappropriation of premiums, Ms.

---

[51] Trial Tr. 100:8-101:2. See also Trial Tr. 102:19-103:19.
[52] Trial Tr. 32:5-21 (emphasis supplied); see also Trial Tr. 34:12-25.
[53] Trial Tr. 34:12-25.
[54] Trial Tr. 34:10-11.

Williams testified that she did not have or did not remember having any discussion about misappropriated premiums with Ms. Barbour.[55]

The Court does not find Ms. Williams' general denials of any discussions about misappropriated premiums to be credible. Misappropriated premiums were what Lexon called Ms. Barbour about, were directly alleged in the Westchester suit, were the subject of her criminal conviction (as to IFIC), and were what Ms. Barbour called Ms. Williams about. The allegedly misappropriated Lexon premiums were – and logically had to have been – a topic of the January 4, 2008 discussions between Ms. Barbour and Ms. Williams, if not their primary focus, and the Court so finds. The Court also finds that when the issue of misappropriated premiums was discussed by Ms. Barbour and Ms. Williams, Ms. Williams falsely denied responsibility and laid all the blame at the feet of her partner, Mr. Edwards.

These findings are further supported by Ms. Williams' testimony when being examined by her husband. There, Ms. Williams again stated that she had "transparent, honest" discussions with Ms. Barbour about the "problems" with her partners, including Mr. Edwards, and the problems they were causing for Surety Solutions.[56] However, Ms. Williams' testimony was that the "problems" were being caused by the actions of her partners. Ms. Williams never indicated that she told Ms. Barbour that Ms. Williams had any involvement in or responsibility for those "problems." Given that three separate instances of alleged misappropriation (Westchester, IFIC and Lexon), at least two of which were discussed directly between Ms. Barbour and Ms. Williams, the Court does not find Ms. Williams' testimony in these regards to be credible.

Additionally, the manner in which the Westchester case was resolved demonstrates that Ms. Williams had significant involvement in those misappropriations. As noted, Ms. Williams

---

[55] Trial Tr. 34:22-25.
[56] Trial Tr. 54:24-55:23.

testified that she borrowed $110,000 from her grandmother to resolve Surety's issues with Westchester; i.e., "*to take care of any restitution I [Ms. Williams] owed Westchester*" with respect to "*premium payments*."[57]  As to that amount, Ms. Williams' partner, Mareco Edwards, eventually contributed $30,000 "because he [Mr. Edwards] owed me money for, you know, the taking of funds."[58]  Thus, despite Ms. Williams' general denials regarding the misappropriation of premiums, the facts reveal that she paid $110,000 to Westchester (of which Mr. Edwards contributed only $30,000) to resolve that claim for unpaid premiums (among other things) and pleaded guilty to misappropriating $38,000 in premiums from IFIC.  Also, Lexon made a claim against Ms. Williams for misappropriated premiums, and threatened to criminally prosecute her. That claim was apparently resolved by the $23,463.40 payment funded by Plaintiff.

In sum, notwithstanding Ms. Williams' general denials, the Court finds that Ms. Williams, in fact, had misappropriated premiums prior to the time Ms. Barbour made the loans to Debtors in January 2008 and did not tell Ms. Barbour that she had done so when specifically asked by Ms. Barbour.  The Court further finds that Ms. Williams made these materially false representations and/or omissions as to Ms. Williams' involvement in the misappropriations to Ms. Barbour to induce her to make the loans to her and her husband, with the intent to deceive Ms. Barbour.

## H.  **The Second Loan for $35,000**[59]

At about this same time – early January 2008 (as further exhibits bear out) – but at a date unstated, Ms. Barbour drove to Debtors' residence to examine Ms. Williams' "book of business"

---

[57] Trial Tr. 55:24-56:3; 56:7-18 (emphasis supplied).
[58] Trial Tr. 57:3-20; and D-4.
[59] Dkt. No. 40, *Final Amended Joint Pre-trial Order*, Part II, Stipulated Facts, ¶ 12.  In other places, the parties identified the Second Loan as $33,000-$35,000.  See Ms. Barbour's testimony at Trial Tr. 106:1-10.

and to decide whether Ms. Barbour could buy it to help Ms. Williams out or hire her at a salary that would be offset by the value of the book of business to Plaintiff:

> MS. BARBOUR:  I was going there [to Debtors' house] to look at her book of business to see if it – what it was worth and you know maybe I could buy it and then help her out. That way it wouldn't technically you know she would have some money.
>
> And I was looking to expand my operation so I thought maybe it would be something good and I was also looking at it to see well if it generated enough income maybe I could hire her on as a full time underwriter and pay her you know a fair amount of money, enough to where this book of business could cover that salary that I would be paying her.[60]

As to this business, Ms. Barbour testified as follows:

> MS. BARBOUR:  I looked at that book of business . . . .  I think Prestige she said was going to – did like 45,000 in commission and there were some other accounts that produced commission.
>
> She was honest and apparently to me she said on one of those lists that the one general contractor was dormant and didn't really produce anything.  She was trying to list out all the columns that she had and the potential for each one.
>
> COUNSEL:  Did you understand her to be showing you that account list as an inducement for you to lend her money?
>
> MS. BARBOUR:  Yeah, I mean I wanted to make sure that I was going to get paid back. . . .
>
> COUNSEL:  When you looked at the account information that [Ms. Williams] provided you, did you believe the accuracy of the information she was giving you?
>
> MS. BARBOUR:  Yes.
>
> COUNSEL:  Did you later find out that it was not accurate?
>
> MS. BARBOUR:  It was not accurate.
>
> COUNSEL:  In what ways was it not accurate?

---

[60] Trial Tr. 103:23-104:8.

> MS. BARBOUR:  The accounts didn't produce much.  I mean they produced very little, if any, commission and one account which was Prestige actually failed to pay its premium on a bond which I think I had paid in anticipation of him paying me so I lost . . . 3,000 or $8,000, but it was a lot of money.

> COUNSEL:    Do you believe that Ms. Williams purposefully misrepresented the value of her accounts to get you to loan her money?

> MS. BARBOUR:  At the time no, but now yes.[61]

As Ms. Williams and Ms. Barbour reviewed these accounts, Ms. Williams advised Ms. Barbour that Mr. Williams and she would probably be moving because they were going to lose the house.[62]  Ms. Barbour corroborated that, when she reached the Debtors' home, she found Ms. Williams upset "because the mortgage company was going to foreclose on her house."[63]  Ms. Barbour herself called the mortgage company, confirmed that the balance due was about $450,000 with arrears in the range of $33,000-$35,000.[64]  Ms. Williams represented to Ms. Barbour that her home in Fort Washington, Maryland, had been "appraised at that time at $950,000 because the National Harbor was being built and all the home equity values were going up significantly."[65] Ms. Barbour confirmed that Ms. Williams told her that the house had a value of $950,000, and that they had $450,000 in equity in it.[66]  Thus, there is no dispute that Ms. Williams told Ms. Barbour that her house was worth $950,000.  However, this colloquy appears to have occurred between Ms. Barbour and Ms. Williams in the latter's home office, wholly or mostly outside the presence

---

[61] Trial Tr. 104:19-105:25; Ex. P-4.
[62] Trial Tr. 37:12-18.
[63] Trial Tr. 104:9-11.
[64] Trial Tr. 106:1-13; Trial Tr. 107:2-13.
[65] Trial Tr. 36:15-18 (Williams Testimony).
[66] Trial Tr. 106:14-22.

20

of Sidney Williams, who joined them later.  As Ms. Williams testified, "Initially I don't think he was in the room when I explained to her the situation."[67]

Ms. Barbour does not appear to have asked the mortgage representative to confirm the value of the property or amount of equity that the Debtors had in it.  Instead, Ms. Barbour testified that she relied on the oral valuation information Ms. Williams provided.[68]  Ms. Barbour further testified that she did not feel that she had an obligation to order an independent appraisal.[69]

In addition to her testimony regarding Ms. Williams' prior statements about not misappropriating any premiums in making the initial loan, Ms. Barbour testified that she lent the Debtors the money to cure the arrears in reliance on their representation about the value of and equity in the house.[70]  Ms. Williams testified that, after Ms. Barbour spoke to the mortgage representative, Ms. Barbour "called her office, they cut a check, and Ms. Barbour literally I mean sent payment within like two days."[71]  Ms. Williams characterized Ms. Barbour's immediate funding of this second loan for $33,000-$35,000  (the "Second Loan") as a "tremendous blessing" and "amazing."[72]

Ms. Barbour testified that she did not learn until sometime after April 15, 2009 (when Ms. Williams advised her that she was closing Surety Solutions) that the house was not worth $950,000.[73]  When Ms. Barbour realized that Ms. Williams would not be able to work off the nearly $65,000 debt ($23,463.40 paid to Lexon/Old Hickory plus $33,000-$35,000 paid to the mortgagee, plus interest), Ms. Barbour checked property values and saw that the Property "wasn't

---

[67] Trial Tr. 36:19-25.  The question regarding "inspections" follows testimony about the $950,000 appraisal.  Ms. Williams answers the question as if it relates to the book of business.
[68] Trial Tr. 107:9-14; see also Trial Tr. 141:22-142:1.
[69] Trial Tr. 145:15-21.
[70] Trial Tr. 106:14-107:1
[71] Trial Tr. 37:23-24.  Neither party produced a copy of the check which represents the loan from Plaintiff/Karen Barbour to the Debtors to pay the mortgage arrears, but there is no dispute that Plaintiff made the Second Loan.
[72] Trial Tr. 37:25-38:1.
[73] Trial Tr. 107:15-22; P-5, April 15, 2009 e-mail.

worth nine fifty."[74]  Ms. Barbour also testified that she lent the money not only in reliance on the

Property value but also in the expectation that Ms. Williams could work the debt off:

> COUNSEL:  And did you lend that money to them for purpose of
> paying back their mortgage based on what you believed to be their
> false representations to you?
>
> MS. BARBOUR:  Yes.  I mean I – it only had been a year and you
> know I was like gosh, I felt like I was swindled out of $65,000.  I
> mean.
>
> COUNSEL:  When you say swindled, what do you mean?
>
> MS. BARBOUR:  Well, I loaned that in good faith and on the
> understanding that Teresa would stay in the agency and produce and
> help me and get that loan paid back.  She had the character and the
> integrity at that time of doing that.
>
> So as soon as the money was lent . . . I felt like well they got
> the money and now I'm not going to get it back.[75]

Notwithstanding Ms. Barbour's use of the words "their" and "they" in referring to Mr. and

Ms. Williams, there was no testimony that Mr. Williams made any representations to Ms. Barbour

about the value of their home, the amount of Ms. Williams' book of business or as to whether

premiums were being misappropriated.  In fact, as noted above, it is unclear (at least) whether Mr.

Williams was even in the same room as Ms. Barbour and Ms. Williams when the value of Ms.

Williams' book of business and the Williams' home was being discussed.

## I.  The January 18, 2008 Promissory Note with Confessed Judgment

On January 18, 2008, just two weeks after the Lexon call, Plaintiff, Ms. Williams as

president of Surety Solutions and Ms. Williams and Mr. Williams, individually, entered a

*Promissory Note with Confessed Judgment* (the "Confessed Judgment") for $65,612.36.[76]  This

Confessed Judgment purports on its face to replace the similarly signed but undated *Promissory*

---

[74] Trial Tr. 107:18-108:11.
[75] Trial Tr. 107:23-108:11.
[76] P-2.

22

*Note* attached below it.[77]  The Confessed Judgment required the obligees to pay the "new total sum of $64,892.13" ($720.23 less than the $65,612.36 face value) on the following terms:  $2,000 on or before April 1, 2009; $10,000 on or before May 1, 2009; and the balance in $2,000 installments beginning on June 1, 2009 and on the 30th of each month thereafter until paid in full.[78]  On default, Plaintiff could seek entry of Judgment on the balance due plus 10% interest, fees and costs.[79]  Mr. Williams and Ms. Williams initialed a change (undated) which converted the $10,000 payment due May 1, 2009 to a $16,000 payment due October 1, 2009.[80]

The underlying, two-page Promissory Note was signed by Ms. Barbour for the Plaintiff, by Ms. Williams for Surety Solutions, LLC, by the Debtors individually and was incompletely dated "_____ January, 2008."[81]  The first paragraph provided for monthly payments of at least $1,055/month on the $65,612.36 debt (representing the debt service that Plaintiff had to pay on its line of credit for borrowing the money that it lent to the Debtors/Surety).[82]  These terms apparently were superseded by the overlying *Promissory Note with Confessed Judgment*.[83]   Paragraphs two through six of the Promissory Note set forth the general terms of the business arrangement between Plaintiff and Ms. Williams/Surety, but did not describe any security for the Loans or include any valuation information.

At trial, the Debtors attempted to show that certain payments were made against the Debt that were not credited by Plaintiff.  Specifically, Debtors alleged uncredited payments to the Barbour Group of $603.88, by Surety Solutions, Check No. 1317, dated February 27, 2008

---

[77] P-2.
[78] P-2.
[79] P-2.
[80] P-2.
[81] P-2, Promissory Note, at 2.  The date was blank in the document submitted into evidence.
[82] P-2, Promissory Note, at 1.
[83] P-2, Promissory Note and Promissory Note with Confessed Judgment.

representing loan interest;[84] $2,000 by Surety Solutions, Check No. 1054, dated September 30, 2008, for "Barbour Group HCC Loan,"[85] and $22,500 by SunTrust Official Check dated March 26, 2008 from Surety Solutions to Barbour Group.  The evidence showed that certain payments were credited by the Barbour Group,[86] i.e., $4,000 indicated as having been "paid" on one of the exhibits.[87]  However, the evidence that the $22,500 represented a payment on the Debt is unconvincing.

First, Ms. Barbour testified that this amount represented "bond premiums from Teresa's clients to surety companies. Had nothing to do with this loan."[88] Further, Ms. Barbour noted that the "Promissory Note with Confessed Judgment" was entered into in 2009 and that the $22,500 payment was made in March 2008.[89]  Thus, a prior payment of $22,500 would have reduced the Debt by that amount.

Additionally, as the parties stipulated, the Circuit Court in Maryland entered a Confessed Judgment against the Debtors and Surety in the amount of $65,746.01 on January 29, 2010.[90]  The Confessed Judgment was subsequently domesticated in New Jersey Superior Court under DJ-125203-13 on July 21, 2013, in the full amount, without any credits.[91]  Finally, the Debt was listed in both the Debtors' bankruptcies at the higher amounts.[92]  Thus, although the Court need not resolve this issue to determine the Debt to Plaintiff to be nondischargeable, the Court would find that the $22,500 was not a payment on account of the Debt, but rather part of the business dealings between Plaintiff and Surety and unrelated to the Debt.

---

[84] D-3.
[85] D-3.
[86] P-3.
[87] P-3.
[88] Trial Tr. 125:14-126:1-5.
[89] See P-2 at final page (with unsigned acknowledgement including 2009 date); and D-3, $22,500 SunTrust Official Check dated March 26, 2008.
[90] Dkt. No. 40, *Final Amended Joint Pre-trial Order*, Part II, Stipulated Facts, ¶ 19.
[91] Dkt. No. 40, *Final Amended Joint Pre-trial Order*, Part II, Stipulated Facts, ¶ 19.
[92] See Section K infra.

**J.  Ms. Williams' Termination of Surety and its Relationship with Plaintiff**

By e-mail dated April 15, 2009, Ms. Williams advised Ms. Barbour that Ms. Williams was

terminating Surety and her relationship with Plaintiffs.  The e-mail states in relevant part:

> Karen,
>        I have given careful consideration and have decided to shut down Surety
> Solutions.  The company is not producing enough income to continue.  Not to
> mention, the past trials and tribulations have taken a tole [sic] and I need to move
> on.  I want to transfer my accounts to you and whatever commission you make you
> keep it and apply it to the debt that is owed.  Sidney has a job lined up form [sic]
> me and we are committed to paying you according to our agreement.[93]

**K.  The Bankruptcy Cases and Adversary Proceeding**

The Debtors filed a voluntary Chapter 7 petition in United States Bankruptcy Court for the

District of Maryland on April 7, 2010.[94]  They scheduled Surety Solutions, LLC as a "non-

operational business with no assets," of which Ms. Williams was 50% owner.  They scheduled

their debt to Plaintiff as a general unsecured claim for $75,722.91 incurred on January 29, 2010.[95]

The Maryland bankruptcy case was dismissed by Order entered on April 29, 2010 for failure to

file credit counseling certificates and to provide Social Security numbers.[96]

As memorialized in the July 18, 2013 press release from the Maryland Office of the

Attorney General, Ms. Williams pleaded guilty in Maryland to one count of misappropriation by

a fiduciary with respect to her agency relationship with IFIC, to which she failed to remit

$38,035.60 which she collected from her client, Prestige Construction Company, from August

2007 through July 2009.[97]  Ms. Barbour testified that after reading the release, she reminded Mr.

---

[93] Ex. P-5, April 15, 2009 e-mail.
[94] Md. Case No. 10-17601 (JPM), Dkt. No. 1.
[95] Ms. Barbour testified that she also lent Ms. Williams $10,000 for "ministry classes" but that Ms. Williams repaid that loan.  Trial Tr. 121:11-122:1.
[96] Md. Dkt. No. 22, April 29, 2010 Order.
[97] Ex. P-7, July 18, 2013 press release; Trial Tr. 15:6-13; 17:2-21:13.

Williams by e-mail that Debtors still owed the Plaintiff money and that Mr. Williams told her they could not afford to pay. Debtors paid nothing further.[98]

The Debtors, through Counsel, filed the instant voluntary Chapter 7 petition in New Jersey on July 15, 2015.[99] On the petition date, Debtors lived in Morristown, New Jersey, where Mr. Williams had served as a pastor for four years. The Debtors had scheduled that Maryland Property as having a value of $350,000 and a first mortgage of $775,979 due Ocwen Loan Servicing.

Debtors scheduled the Plaintiff as a general unsecured creditor for $66,746 based on the Maryland Judgment as domesticated in New Jersey.[100] The Debtors scheduled $547,795 in general unsecured claims, including the Plaintiff's claim, and $356,792 in student loan obligations. On Schedule J, Debtors listed as an expense a $475/month restitution payment to IFIC.[101] The Debtors received their discharge for other dischargeable debts on January 11, 2017.[102]

The Plaintiff timely filed the instant five-count adversary proceeding on October 19, 2015 (i) to except the Judgment from discharge under 11 U.S.C. § 523(a)(2)(A), (2)(B), (4), or (6); and (ii) to deny the Debtors' discharge under 11 U.S.C. § 727(a)(2) or (4).[103] The Debtors answered on November 30, 2015[104] and generally denied liability to Plaintiff. The Plaintiff filed a motion for summary judgment on May 18, 2016.[105] After multiple adjournments as a courtesy to the Debtors, who appeared *pro se* in the adversary proceeding, the Debtors filed an objection on October 12, 2016, and the Plaintiff, a reply on October 28, 2016.[106] The Court denied the Plaintiff's motion for summary judgment by Order entered on December 27, 2016.[107] The Court

---

[98] Trial Tr. 110:17-111:7.
[99] Main Dkt. No. 1.
[100] Main Dkt. No. 1, Schedule F and SoFA, ¶ 4a.
[101] Main Dkt. No. 1, Schedule J.
[102] Main Dkt. No. 27.
[103] The Complaint is misnumbered and ends with a sixth count; there are only five.
[104] Dkt. No. 4.
[105] Dkt. No. 18.
[106] Dkt. Nos., 25, 27.
[107] Dkt. No. 29, December 27, 2016 Order denying summary judgment.

entered a final Joint Scheduling Order on January 31, 2017.[108]  The parties filed a joint pre-trial

statement on June 29, 2017.[109]  The Court conducted the trial on June 30, 2017.

## IV.    STATEMENT OF LAW/CONCLUSIONS OF LAW

### A.   The General Standards

As noted above, the Plaintiff seeks to except the entirety of Plaintiff's Debt from discharge

under 11 U.S.C. § 523(a)(2)(A), (4) and (a)(6).  The Plaintiff focused on § 523(a)(2)(A), actual

fraud at trial, but the Plaintiff's post-trial submission invokes the § 523(a)(6) exception as well.[110]

The Plaintiff referred to 11 U.S.C. § 523(a)(2)(B) in passing in its pre-trial statement and not at all

in its post-trial brief.[111]   Other than in the Complaint, § 523(a)(4) is not mentioned at all in

Plaintiff's pre- or post-trial submissions, nor is it applicable based on the facts adduced at trial.

Thus, the § 523(a)(4) claim is deemed abandoned and is dismissed on the merits in any event.

11 U.S.C. 523(a)(2)(A) and (6) state in relevant part:

(a) A discharge under section 727 . . .  of this title does not discharge an individual
debtor from any debt-- . . .

> (2) for money, property, services, or an extension, renewal, or refinancing
> of credit, to the extent obtained by—
>
> > (A) false pretenses, a false representation, or actual fraud, other than a
> > statement respecting the debtor's or an insider's financial condition;
> > . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the
> property of another entity

11 U.S.C. § 523(a)(2)(A) and (6).  The Plaintiff must establish each element of an exception to

discharge claim by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 286-90

(1991).  "The overriding purpose of the Bankruptcy Code is to relieve debtors from the weight of

---

[108] Dkt. No. 31.
[109] Dkt. No. 40, *Final Amended Joint Pre-Trial Order*.
[110] Dkt. No. 44, at 15.
[111] Dkt. No. 40, *Final Amended Joint Pre-Trial Order*, at 13; Dkt. No. 44, Plaintiff's post-trial Br.

oppressive indebtedness and provide them with a fresh start. Exceptions to discharge are strictly construed against creditors and liberally construed in favor of debtors." *In re Cohn*, 54 F.3d 1108, 1113 (3d Cir. 1995).

### B.  Exception to Discharge under 11 U.S.C. § 523(a)(2)(A)

Among the three grounds for exception to discharge under 11 U.S.C. § 523(a)(2)(A) (false pretense, false representation, and actual fraud), courts sometimes differentiate false pretense from false representation based on whether the debtor's misrepresentation is implied (false pretense) or express (false representation). *In re August*, 448 B.R. 331, 349 (Bankr. E.D. Pa. 2011) (and cases cited therein). *See also In re Grant*, 237 B.R. 97, 113 (Bankr. E.D. Va. 1999) (false representation is express, while false pretense includes conduct designed "to create and foster a false impression") (internal citations omitted).  The court in *In re Grant* allowed that silence and omission may constitute a false representation.[112]

The third cause of action under 11 U.S.C. § 523(a)(2)(A) is for actual, or common-law fraud, not merely fraud implied in law.  *Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir. 1997); *In re McIntyre*, 64 B.R. 27, 29 (D.N.H. 1986).  The elements of common-law fraud applied under 11 U.S.C. § 523(a)(2)(A) are that: (i) the debtor made a misrepresentation to the plaintiff; (ii) the debtor knew that the representation was false when she made it; (iii) the debtor intended to deceive the plaintiff with the misrepresentation; (iv) the plaintiff justifiably relied on the misrepresentation; and (v) the plaintiff suffered damage as a result.  *In re Santos*, 304 B.R. 639, 651, 666-67 (Bankr. D.N.J. 2004);[113] *Field v. Mans*, 516 U.S. 59, 73-75 (1995); *In re Cohen*, 185 B.R. 171 (Bankr.

---

[112] When Judge Fox in *In re August*, 448 B.R. 331, 349-50 (Bankr. E.D. Pa. 2011), following his decision in *In re Antonius*, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006), set forth the elements of a false pretense and a false representation claim, they were nearly indistinguishable from an actual fraud claim.  This Court agrees.

[113] *In re Santos* erroneously refers to "reasonable" rather than "justifiable" reliance for fraud elements but analyzes the case based on the plaintiff's justifiable reliance.

28

D.N.J. 1994); *In re Cohen*, 185 B.R. 180, 186 (Bankr. D.N.J. 1995), *aff'd*, 191 B.R. 599 (D.N.J.

1996), *aff'd*, 106 F.3d 52 (3d Cir. 1997), *aff'd*, 523 U.S. 213 (1998).

The first element, material misrepresentation, "may include words (written or oral), conduct,

or omissions." *In re Drossel*, 2007 WL 3375073, at *6 (Bankr. D.N.J. Nov. 7, 2007) (citing *In re*

*Santos*, 304 B.R. at 661. "Such misrepresentation must be materially false, defined as 'an important

or substantial untruth.'" *In re Drossel*, 2007 WL 3375073, at 6 (citing *In re Santos*, 304 B.R. at 662,

citing *In re Cohn*, 54 F.3d at 1114).

The second and third elements of actual fraud require "knowledge of . . . falsity and an intent

to deceive." *In re Cohen*, 185 B.R. at 177. "[I]ntent to deceive requires proof of a specific intent."

*In re Chen*, 227 B.R. 614, 626 (D.N.J. 1998).  "[B]ecause a debtor will rarely, if ever, admit that

deception was his purpose," the Third Circuit, along with at least three other circuits, "hold[s] that

the intent to deceive can be inferred from the totality of the circumstances, including the debtor's

reckless disregard for the truth." *In re Cohn*, 54 F.3d at 1118-19; *In re Cohen*, 191 B.R. at 604; *In*

*re Santos*, 304 B.R. at 666 (assessing "whether the debtor's actions 'appear so inconsistent with [his]

self-serving statement of intent that the proof leads the court to disbelieve the debtor'") (citations

omitted).  Proving reckless indifference to the truth will satisfy both knowledge of falsity and the third

element, intent to deceive. *In re Cohn*, 54 F.3d at 1119; *In re Bocchino*, 794 F.3d 376, 382 (3d Cir.

2015) (finding the scienter requirement under § 523(a)(2)(A) satisfied by the debtor's "gross

recklessness" in his statements to his investor-clients).

The fourth element of the common-law fraud claim in bankruptcy requires "justifiable, but

not reasonable, reliance." *Field v. Mans*, 516 U.S. at 73-75 (citing *In re Vann*, 67 F.3d 277, 281 (11th

Cir. 1995)); *In re Kirsh*, 973 F.2d 1454, 1459-60 (9th Cir. 1992).  The Supreme Court in *Field v.*

*Mans* determined that Congress intended to "adopt a common-law understanding of the terms it

used" under § 523(a)(2)(A) and therefore made a clear distinction between justifiable reliance and

reasonable reliance. *Field*, 516 U.S. at 70.   The Court, citing RESTATEMENT (SECOND) OF TORTS,

§ 545A cmt. b (AM. LAW INST. 1976), stated:

> Although the plaintiff's reliance on the misrepresentation must be
> justifiable ... this does not mean that his conduct must conform to the
> standard of the reasonable man. Justification is a matter of the qualities
> and characteristics of the particular plaintiff, and the circumstances of
> the particular case, rather than of the application of a community
> standard of conduct to all cases.

*Field*, 516 U.S. at 70-71, quoting RESTATEMENT (SECOND) OF TORTS, § 545A cmt. b (AM. LAW.

INST. 1976).

The fifth and final element of actual fraud requires the plaintiff to suffer a loss proximately

caused by defendant's conduct. *See In re Santos*, 304 B.R. at 669.

## C.  Exception to Discharge under 11 U.S.C. § 523(a)(2)(B)

The parties' exchange of information regarding Ms. Williams' "book of business,"[114] and

the value of the Property, to the extent they "respect[ ] the debtor's . . . financial condition,"

compels the Court to consider 11 U.S.C. § 523(a)(2)(B) as well. The elements that the plaintiff

must establish to except a debt from discharge under 11 U.S.C. § 523(a)(2)(B) are explicit in the

statute, and are similar to the standard for a false representation and § 523(a)(2)(A), except that

(B) requires a *written* statement:

(i)     that is materially false;

(ii)    respecting the debtor's or an insider's financial
condition;

(iii)   on which the creditor to whom the debtor is liable for
such money, property, services, or credit reasonably
relied; and

(iv)    that the debtor caused to be made or published with
intent to deceive . . . .

---

[114] P-4, Ms. Williams' "book of business."

11 U.S.C. § 523(a)(2)(B).  On its face, § 523(a)(2)(B), requires the higher threshold of reasonable

reliance, as compared to § 523(a)(2)(A), which requires the lower threshold of justifiable reliance.

*In re Cohn*, 54 F.3d at 1114.  Otherwise, the standards are similar, if not identical, to § 523(a)(2)(A)

claims.  *See, e.g. In re Cohn,* 54 F.3d at 1118-19.  Thus, "a creditor can establish intent to deceive by

proving reckless indifference to, or reckless disregard of, the accuracy of the information in the

financial statement of the debtor when the totality of the circumstances supports such an inference."

*Id*. at 1119.

Because the proofs offered at trial were markedly different as to Teresa Williams and

Sidney Williams, the Court will separately analyze the nondischargabiliy claims against each of

them.  Additionally, because there were two separate loans made at different, although closely

related times, the Court will also separately analyze each loan as to each party, starting with Teresa

Williams.  Finally, the Court will analyze only the Second Loan for $33,000-$35,000 under the

criteria for exception to discharge under § 523(a)(2)(B), because it depended upon a "statement . .

. respecting the debtor's . . . financial condition," that is, Ms. Williams' "book of business"[115] and

the value of the Property.

### 1. <u>Teresa Williams</u>

#### (a) <u>The Initial Loan</u>

As was noted, on the very same day (January 4, 2008) that she received the call from

Lexon, Ms. Barbour made the Initial Loan of $23,463.40 to pay the amount due Lexon by directly

paying Lexon that amount on Ms. Williams' and Surety's behalf.  Immediately prior to the time

the Initial Loan was made, Ms. Barbour asked Ms. Williams whether she had misappropriated any

premiums from Lexon (or otherwise).  When asked, Ms. Williams denied misappropriating any

---

[115]P-4.

premiums. As was also noted above, the Court credits the specific and detailed testimony of Ms. Barbour in these regards and rejects Ms. Williams' general denials as to any conversations about misappropriated premiums as not plausible or credible. The Court finds that Ms. Williams' denials were false, material and knowingly made.

The denials were false because at the time Ms. Williams had incurred significant liabilities for misappropriated premiums (among other potential liabilities) as demonstrated by: (i) the $110,000 she personally paid to Westchester (from funds borrowed from her family) for premiums that were misappropriated by her (and presumably Mr. Edwards) as to which only $30,000 was reimbursed by Mr. Edwards; (ii) her subsequent guilty plea to misappropriating premiums in the amount of $38,035.60 from IFIC from August 2007 to July 2009; and (iii) the $23,463.40 payment to Lexon on her behalf by Plaintiff that gave rise to the Initial Loan.

There is no question that these representations were material to Ms. Barbour as she directly asked Ms. Williams about the claims and testified that she would not have made any loan to the Debtors if she knew Ms. Williams was misappropriating premiums. As noted, the Court finds Ms. Barbour's testimony in these regards to be specific and credible, in contrast to Ms. Williams' general denials. In fact, the entire reason for Ms. Barbour's call to Ms. Williams on January 4, 2008 was Lexon's claim of misappropriated premiums. Therefore, it had to have been discussed. For the same reasons, the Court finds that the false denials were knowingly made by Ms. Williams, as she knew she had misappropriated premiums (from at least Westchester, IFIC and Lexon) and ultimately paid substantial sums to make "restitution" of those amounts.

As to reliance, the Court again resolves the conflicting testimony in favor of Ms. Barbour, though this is a closer call. There is no question that Ms. Barbour was aware of the claims of misappropriation by Westchester and Lexon at the time Ms. Barbour made the loans. Nor is there any question that these "problems" were known to both Ms. Barbour and Ms. Williams.

As the Court has already found that Ms. Williams misrepresented her involvement in the misappropriations, the question then becomes whether Ms. Barbour was justified in relying on Ms. Williams' denials. This is a subjective test based on the particular circumstances of each case. *Field,* 516 U.S. at 70-72.

The circumstances here were that Ms. Barbour and Ms. Williams had not only a business relationship, but also a personal one. In fact, Ms. Williams considered them to be "friends."[116] Additionally, Ms. Williams described the personal and business "challenges" she was facing, including the claims by Westchester and Lexon, the C-section, the illness (and eventual death) of Mr. Williams' mother, and the possible foreclosure of their home. In these circumstances, the Court finds Ms. Barbour justifiably relied on Ms. Williams' denials because she was a friend and long-time business associate. And though Ms. Barbour's motives were not purely altruistic -- she was also plainly interested in Ms. Williams' book of business and particularly her relationship with bonding companies like Travelers -- the Court also finds that Ms. Barbour acted reasonably in the circumstances by loaning money to a friend and business associate to help Ms. Williams (and help Ms. Barbour herself in her own business) and that she understandably relied on Ms. Williams denials in making the Loans. The Court thus determines that Ms. Barbour's reliance on Ms. Williams' denial of any involvement in the misappropriations was justifiable.

There is and was no real dispute that the Debtors owed money to Plaintiff, although the amount was belatedly challenged by Debtors. The Court need not determine the precise amount now due, but notes that the Confessed Judgment, the Domesticated Judgment and the Debtors' Bankruptcy Petition all reflect the higher amount(s) claimed by Plaintiff. Thus, there is no issue

---

[116] Trial Tr. 21:17-20; 82:13-19.

as to whether Plaintiff was damaged.  As a result, the Initial Loan is nondischargeable as to Ms. Williams.

### (b) The Subsequent $35,000 Loan

As noted above, shortly after the Initial Loan of $23,463.40 in January 2008, Plaintiff made another loan to the Debtors and Surety in the amount of $35,000 (the "Second Loan").[117] The purpose of this Second Loan was to provide the Debtors with the funds necessary to cure the arrears on their mortgage and prevent its foreclosure.[118]

The need for the Second Loan came up when Ms. Barbour drove to the Debtors' residence in early 2008 to review Ms. Williams' book of business so that Ms. Barbour could determine whether a business arrangement could be made that would provide Ms. Williams with some ongoing earnings, allow her to repay the Debt, and also provide Plaintiff with additional business opportunities through Ms. Williams' "market" access.[119]  Upon arriving at the Debtors' home, Ms. Barbour found Ms. Williams upset because she was going to lose her home to foreclosure and the Debtors would have to move.[120]  In response to Ms. Barbour's inquiry, Ms. Williams advised that the arrears on the mortgage were $33,000-$35,000 and that the total mortgage balance was about $450,000.

As an initial matter, the Court finds that Ms. Williams' misrepresentations as to the Initial Loan carried over to the Second Loan, as Ms. Barbour repeatedly testified that she would not have made the Initial Loan if she had known that Ms. Williams had in fact misappropriated premiums. *A fortiori,* she would not have made the Second Loan if she knew about the misappropriations.

---

[117] Dkt. No. 40, *Final Amended Joint Pre-trial Order*, Part II, Stipulated Facts, ¶ 12.  Elsewhere the parties referred to both $33,000 and $35,000 as the amount needed to cure the arrears on the Debtors' mortgage.  Trial Tr. 106:1-13.
[118] Trial Tr. 37:12-18.
[119] Trial Tr. 103:3-105:12.
[120] Trial Tr. 37:12-18 (Williams); 104:9-11 (Barbour).

Thus, the Court need go no further to determine that, for the same reasons the Initial Loan is nondischargeable as to Ms. Williams, the Second Loan is also nondischargeable as to her.

Though not necessary to its decision, the Court would not find that Ms. Williams' representations as to the value of her home or book of business were knowingly or intentionally false or actionable under § 523(a)(2)(A) or (B). The Court finds that Ms. Williams was providing her personal opinion of value based on what she thought, rather than with the intent to deceive Ms. Barbour.

Additionally, and dispositively, based on the Supreme Court's recent decision in *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S.Ct. 1752, 1757, 1764 (2018), even a statement about a single asset must be in writing to be actionable under 11 U.S.C. § 523(a)(2). Under *Appling*, Ms. Williams' statements about the value of her home fall squarely within 11 U.S.C. § 523(a)(2)(B) as "respecting the debtor's . . . financial condition" and therefore must be in writing. *Appling*, 138 S.Ct. at 1761 (indicating that a statement as to a debtor's equity in his home is one which would have to be in writing). Since Ms. Williams' statements regarding her home's value were oral, they are not actionable under § 523(a)(2)(A) or (B).

As to Ms. Williams' book of business, the Court does not find any intentional misrepresentation by Ms. Williams. She informally – in handwriting on a sheet of paper – gave Ms. Barbour her estimates of potential business, which Ms. Williams and Ms. Barbour went over in some detail, including the fact that at least one client was probably "dormant." That the revenues from these sources did not result in full payment was not a fraud or Ms. Williams' responsibility. She was not a guarantor. Further, Ms. Barbour's asserted reliance on this single, handwritten sheet of paper was not justifiable or reasonable in the circumstances as the basis of the Second Loan. Thus, this aspect of Plaintiff's claim would fail if it were the sole basis for the nondischargeability of the Second Loan.

35

However, as the Court previously found, Plaintiff would not have made the Initial Loan or the Second Loan to the Debtors if Plaintiff knew about Ms. Williams' material misrepresentations as to the misappropriated premiums, which were knowingly made. Plaintiff justifiably relied on Ms. Williams' denials in making the Initial and Second Loan to Debtors, resulting in damages in the amount of the Debt. Thus, the entire Debt is nondischargeable as to Ms. Williams.

### 2. Sidney Williams

#### (a) The Initial Loan

There was no proof offered at trial as to Mr. Williams' involvement in any of the business dealings between Barbour and Surety that predated the Initial Loan. Similarly, and more significantly, there was no evidence that Mr. Williams was involved in any of the discussions between Ms. Barbour and Ms. Williams that led up to the Initial Loan, including the discussions between Ms. Barbour and Ms. Williams about Lexon and the Complaint filed by Westchester.[121] There was also no testimony or documentary evidence that Mr. Williams was involved in any of the business transactions between Surety and Ms. Williams, on the one hand, and Barbour Group and Ms. Barbour, on the other hand, with respect to the "sub-brokering" arrangement between the parties, or the development of business relationships with any of the "markets" Ms. Williams had access to or otherwise. Nor was there any indication at trial that Mr. Williams had anything to do with the business arrangement between Ms. Barbour and Ms. Williams by which Ms. Williams would "work off" the loans.

Similarly, there was no evidence that Mr. Williams had any involvement (or was even present) when Ms. Barbour called Ms. Williams on January 4, 2008 about the call she received from Lexon accusing Ms. Williams of misappropriating premiums, or when Ms. Barbour then

---

[121] Mr. Williams was not named as a defendant in that action, although Ms. Williams and Surety were.

confronted Ms. Williams about Lexon's claim and Ms. Williams' denial.  That same day, Ms. Barbour wrote the $23,463.40 check to pay the Lexon obligation, without indication (or evidence) of any involvement by Mr. Williams.  Mr. and Ms. Williams subsequently signed a Promissory Note and Confessed Judgment (and underlying Promissory Note) with respect to the Initial Loan and Second Loan, but those documents are the only evidence of Mr. Williams' involvement in the Initial Loan.

In sum, the Court finds that Plaintiff did not carry its burden of proving that Mr. Williams made any misrepresentations to Ms. Barbour regarding the Initial Loan of $23,463.40, or that he had any involvement in the discussions that led up to that Loan.  Nor was it possible, based on the evidence presented, that Ms. Barbour could have relied in any way -- justifiably or otherwise -- on anything Mr. Williams said or did because the undisputed testimony was that Plaintiff made the Initial Loan immediately after the discussion between Ms. Barbour and Ms. Williams regarding Lexon.  Mr. Williams was simply not involved in those discussions.

These findings are confirmed by Ms. Barbour's testimony, e.g., "[a]ll the information I had available to me is what Teresa Williams told me"[122] and in Plaintiff's post-trial brief, where Plaintiff argues that it is undisputed that the Barbour Group made the Initial Loan of $23,463.40 Loan "to Teresa Williams based on Ms. Williams affirmative promise that she was not guilty of misappropriating insurance premiums." [123]  No mention is made of Mr. Williams.  Accordingly, Plaintiff's claims against Mr. Williams as to the Initial Loan of $23,463.40 are dismissed.

### (b)    The Second Loan

As noted above, the Second Loan, in the amount of $35,000, was made by Plaintiff to Debtors in early January 2008 (sometime shortly after the Initial Loan) to allow them to cure the

---

[122] Trial Tr. 131:10-11.
[123] Dkt. 44, Plaintiff's post-trial Br., at 1.  See also *id*. at 5-7.

arrearages on the mortgage on their house, which was facing foreclosure.  Not unlike the Initial

Loan, there was little evidence presented at trial as to Mr. Williams' involvement in the

discussions leading up to the Second Loan.  As with the Initial Loan, there is no question that

Mr. Williams knew about the Second Loan, as he signed the Initial Promissory Note and the

Promissory Note with Confessed Judgment, which combined the two Loans into the Debt.[124]

Thus, the remaining question for this Court to determine as to Mr. Williams is whether he made

any false statements to Ms. Barbour to induce her to make the Second Loan, specifically as to

the value of the Property or Ms. Williams' book of business.

As with Ms. Williams, the issue as to the value of the Property is governed by the

Supreme Court's recent decision in *Appling*, 138 S.Ct. at 1761, 1764.  Because the statements as

to the value of the Property were oral (and made by Ms. Williams) and relate to the Debtor's

financial condition, they are not actionable under § 523(a)(2)(B) because they were not in writing.

*Appling*, 138 S.Ct. at 1761.  Further, the testimony at trial was that Plaintiff made the Second

Loan when Ms. Barbour drove to the Debtors' home to meet with Ms. Williams and examine her

book of business sometime after making the Initial Loan.  Upon arriving, Ms. Barbour saw Ms.

Williams distraught and learned about the mortgage arrears and possible foreclosure.  However,

the testimony of both Ms. Williams and Ms. Barbour was that the meeting was between the two

of them and that the representations or statements that led to the Second Loan were made by Ms.

Williams,[125] including particularly as related to the value of the Property and Ms. Williams' book

of business.

Ms. Barbour testified that it was Ms. Williams who: (i) told Ms. Barbour that she was

facing foreclosure on her home and how much was owed to the bank; (ii) also told Ms. Barbour

---

[124] P-2.
[125] Trial Tr. 36:15-18 (Williams).

that the Property was worth $950,000; (iii) provided Ms. Barbour with the written and oral information relating to her book of business;[126] and (iv) told Ms. Barbour that she would work for Plaintiff in an effort to repay the Debt.[127]  Also in a similar fashion as the Initial Loan, Ms. Barbour arranged for the Second Loan to be funded immediately after her meeting at the Debtors' home.[128]  Mr. Williams' involvement in these discussions was apparently minimal, if there was any at all.  According to Ms. Williams, Mr. Williams only entered the room towards the end of the discussions between Ms. Williams and Ms. Barbour described above:

> COUNSEL:    Was Mr. Williams present for these inspections?[129]
>
> MS. WILLIAMS:    I don't know honestly because she came to my home office and it was her and I one-on-one. I think he did, he probably did come in when it came to the point where she said she wanted to loan us the money.  I'm sure he was a part of that discussion, yes.  Initially I don't think he was in the room when I explained to her the situation.[130]

Mr. Williams, who handled the examination of both Ms. Williams and Ms. Barbour for the Debtors, was not called as a witness by either side, and the testimony quoted immediately above was not contradicted by Plaintiff.  Thus, the Court has only the testimony of Ms. Barbour and Ms. Williams and the exhibits admitted into evidence to consider as to Mr. Williams' involvement in any alleged misrepresentation as to the Second Loan.  Considering all that evidence, the Court finds that the representations as to Ms. Williams' book of business, the work

---

[126] P-4.

[127] Trial Tr. 103:20-106:22.  In this regard, the Court notes that, although some general leading questions were asked about Mr. and Ms. Williams making a representation as to the value of the house (see Trial Tr. 106:1-107:1), Ms. Barbour herself later repeatedly testified on cross-examination that it was Ms. Williams who made the statements about the home's value.  See e.g., Trial Tr. 140:25-141:3; 141:9-10; 141:18-142:1; 145:15-21 (all indicating Teresa provided the valuation information).  See also Plaintiff's post-trial Br. at 11.

[128] Trial Tr. 37:4-38:1.

[129] The word "inspections" in this sentence seems to be a transcription error as both the context and prior testimony relate to the discussions between Ms. Barbour and Ms. Williams (Trial Tr. 35:22-36:18), as does Ms. Williams' response quoted above.  Further, there was no other testimony or evidence indicating there were inspections of any kind.  Thus, the Court finds that this testimony relates to the discussions between the parties rather than any "inspections."

[130] Trial Tr. 36:19-25.

she would do and the value of the Property were made by Ms. Williams to Ms. Barbour and were, for the most part, made outside the presence of Mr. Williams.

The failure to make any mention of the Property or its value in the Promissory Note or Confessed Judgment,[131] combined with Mr. Williams' late arrival to the conversation in which the Property, its value and Ms. Williams' book of business were discussed and the immediate funding of the Second Loan by Plaintiff, all further support this Court's finding that Mr. Williams did not make any representations regarding the Property or its value and that even if he did, those representations could not have been justifiably relied upon by Ms. Barbour.

In sum, based on its review of the testimony and evidence at trial, the Court finds that Mr. Williams did not make any misrepresentations to Ms. Barbour as to the value of the Property or Ms. Williams' book of business.  Even if Mr. Williams just stood silently by when Ms. Williams told Ms. Barbour that she believed the Property was worth $950,000 or discussed her book of business, any alleged reliance by Ms. Barbour on *Mr.* Williams' silence was not justifiable in the circumstances, as there was simply no credible, specific evidence presented that he was asked by Ms. Barbour what Ms. Williams' book of business (or the Property) was worth or that Mr. Williams affirmatively provided any valuation information to her.

Finally, and dispositively, any representation as to the value of the Property would have to be in writing under the recent *Appling* decision, 138 S.Ct. at 1761, 1764.  There was no writing of any kind introduced as to the value of the Property.  And while the handwritten sheet regarding Ms. Williams' book of business was in writing, it was prepared by Ms. Williams, with no evidence of any involvement by Mr. Williams—or even that Mr. Williams had any knowledge as to its worth.  Thus, Plaintiff has not met its burden of proving that Mr. Williams made any

---

[131] P-2.

representations as to the value of Ms. Williams' book of business or the Property, in writing or

orally, or that Plaintiff justifiably or reasonably relied on anything Mr. Williams said or did in

making the Loans.

Accordingly, judgment will be entered dismissing the Complaint as to Mr. Williams with

respect to the Second Loan as well and determining that the entire Debt is dischargeable and was

discharged as to Mr. Williams.

## V.  <u>**CONCLUSION**</u>

For all the foregoing reasons, the Court finds that (i) the entire Debt is nondischargeable

as to Ms. Williams; and (ii) the entire Debt is dischargeable as to Mr. Williams.  An accompanying

Order is simultaneously being entered by the Court.

DATED:  July 5, 2018

/s/ Vincent F. Papalia
VINCENT F. PAPALIA
UNITED STATES BANKRUPTY JUDGE